WILLIAM BRADSHAW
D-73217 GW-325U
P.O. Box 689
Soledad, CA. 93960-0689

FILED

08 AUG 20 PM 12 50

SHARON W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In the matter of                )
                                )       Case No. C 08-1787 JF (PR)
WILLIAM BRADSHAW                )
                                )
On Habeas Corpus.               )
                                )
                                )

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
TRAVERSE TO RESPONDENTS' RETURN TO ORDER TO SHOW
CAUSE RE PETITION FOR WRIT OF HABEAS CORPUS

WILLIAM BRADSHAW
Petitioner, In Pro Per

## TABLE OF AUTHORITIES

Authority

PAGE

### CONSTITUTIONAL AUTHORITIES

Fourteenth Amendment to the United States Constitution    passim

### FEDERAL CASE LAW

Barapind v. Enomoto, 400 F.3d 744 (9th Cir. 2005)    12

Board of Pardons v. Allen, 482 U.S. (1987)    3

Biggs v. Terhune, 334 F.3d 910 (9th Cir.2003)    10, 11

Carey v. Musladin,___,U.S.___,127 S.Ct. 649 (2006)    3,  4

Greenholtz v. Nebraska Inmates, 442 U.S. 1 (1979)    2   3

Godfrey v. Georgia, 442 U.S. 420 (1980)    6

Irons II], 479 F.3d 658 (9th Cir. 2007)    passim

Irons v. Carey, 505 F.3d 951 (9th Cir. 2007)    11

Maynard v. Cartwright, 486 U.S. 356 (1988)    6

McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002)    passim

Penetti v. Quarterman,___,U.S.___,127 S.Ct. 2842 (2007)    4

Martin v. Marshall, 431 F.Supp.2d 1038 (C.D. Cal. 2006)    12

Rosenkrantz VI], 444 F.Supp.2d 1063 (C.D. Cal. 2006)    9

Sanchez v. Kane, 444 F.Supp.2d 1049 (C.D. Cal. 2006)    9, 12

Sass v. Ca. Brd. of Prison Trms., 461 F.3d 1123 (9th Cir. 2006)    passim

Superintendent v. Hill, 472 U.S. 445 (1985)    passim

### STATE CASE LAW

In re Ernest Smith, 114 Cal.App.4th 343 (2003)    passim

In re Lee, 143 Cal.App.4th 1400 (2006)    9, 10

In re Rosenkrantz [Rosenkrantz V], 29 Cal.4th 616 (2002)    passim

In re Scott, 119 Cal.App.4th 871 (2004)    7

In re Scott [Scott II], 133 Cal.App.4th 573 (2005)    passim

In re Van Houten, 116 Cal.App.4th 339 (2004)    7

TABLE OF AUTHORITIES

AUTHORITY

PAGE

STATE CASE LAW

In re Weider, 145 Cal.App.4th 570 (2006)                    9

WILLIAM BRADSHAW
D-73217  GW-325U
P.O. Box 689
Soledad, CA. 93960-0689

Petition, In Pro Per

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM BRADSHAW,                    )   Case No. C 08-1787 JF (PR)
                                     )
              Petitioner,            )   MEMORANDUM OF POINTS AND
                                     )   AUTHORITIES IN SUPPORT
    vs.                              )   OF TRAVERSE
                                     )
                                     )
B. CURRY, Warden, et al,             )   Judge: Hon. JEREMY FOGEL
                                     )             U.S. District Judge
              Respondent.            )
                                     )

INTRODUCTION

Respondent argues that Petitioner does not have a federally protected liberty interest in parole, that Petitioner did not show that the court's adjudications were either "contrary to" or an "unreasonable application of" U.S. Supreme Court precedent, that Petitioner was afforded all due process in his hearing which he is entitled to, and that there is no "some evidence test" in the parole context in established federal law.

As Petitioner argues post, he like similarly situated California prisoners, have:

1) Had their Plea Bargain Agreements rendered "moot" as the Board ignores the level of egregiousness pleaded to and accepted in their

agreement with the state and finds them unsuitable based on the unadjudicated, unproven allegations about the offense they committed as represented by the District Attorney's Office. Typically, as in Petitioner's case, the offense is likened to a Special Circumstances First Degree Murder which carries a penalty of life-without-parole; and,

2) been denied their liberty interest in parole that is protected by the Federal Constitution. This interest has been consistently recognized by state and federal courts including the Ninth Circuit.

LEGAL ARGUMENT

I.    RESPONDENT'S ARGUMENT THAT PETITIONER HAS NO DUE PROCESS RIGHTS BEYOND BEING ALLOWED TO PARTICIPATE IN THE HEARING AND BE TOLD OF THE BASIS FOR THE DENIAL IS INCONSISTENT WITH CLEAR NINTH CIRCUIT AUTHORITY.

Respondent's attempt to lessen Petitioner's due process rights that should be afforded him at his parole hearing by stating that he is entitled to no more than a opportunity to be heard and to be told why he falls short of qualifying for parole. (Answer, p.5, citing Greenholtz v. Inmates of Nebraska Penal & Corrections Complex, 442 U.S. 1, 16 (1979).) However, in Superintendent v. Hill, 472 U.S. 445, 457 (1985), the Supreme Court clearly ruled that due process requires court review of the sufficiency of the evidence when a liberty interest is invoked, and in that context applied the "some evidence" standard to prison disciplinary hearings. In Sass v. California Board of Prison Terms, supra, 461 F.3d 1123, 1129 (9th Cir. 2006); Irons II, supra, 479 F.3d 658 (9th Cir. 2007); and McQuillion v. Duncan, supra, 306 F.3d 895, 904 (9th Cir.2002), Hill was cited as a basis for applying the "some evidence" standard to parole hearings. in fact, the Ninth Circuit in Sass specifically stated,

    To hold that less than the some evidence standard is required

1      would violate clearly established federal law because it would
2      mean that a state could interfere with a liberty interest-that
    in parole-without support or in an arbitrary manner. We therefore
    reject the state's contention that the some evidence standard
3      is not clearly established in the parole context.

4  (Sass v. California Board of Prison Terms, supra, 461 F.3d 1123, 1129

5  [9th Cir. 2006].) Respondent is ignoring this established Ninth Circuit

6  authority, arguing that Carey v. Musladin, U.S. 127 S.CT. 649 (2006),

7  which deals with a different set of circumstances, somehow means that

8  Greenholtz restricts parole applicants to the type of rights that would

9  apply in a state that does not use the mandatory language in its parole

10  statute. However, in Board of Pardons v. Allen, 482 U.S. 369-378 (1987),

11  a case decided after Greenholtz, the Supreme Court stated that a liberty

12  interest arises out of the state's mandatory language in their parole

13  statute. Allen, 482 U.S. at 377-378. California Penal Code §3041 is

14  precisely such a statute, as the Ninth Circuit has repeatedly determined

15  in cased such as McQuillion, Sass, and Irons II.

16      Respondent's citation of Musladin in its argument fails the test.

17  A proper examination of that decision shows that the Ninth Circuit is

18  correct, and Hill is in fact clearly established federal law under AEDPA,

19  and as such, Petitioner is clearly entitled to an evidentiary review using

20  the "some evidence" standard. Respondent's argument is that in the absence

21  of a Supreme Court decision specifically applying that standard to prison

22  parole hearings, it is not considered established Supreme Court law. With

23  Musladin. the Court was faced with  the potentially prejudicial effect

24  of conduct by civilian courtroom spectators, While Petitioner relies on

25  cases which deal with the potentially prejudicial conduct of the state.

26  In a constitutional context, the actions by the state create a different

27  situation than the conduct of a civilian spectator. The Supreme Court,

28  since Musladin, has clarified the role of federal precedent, and its impact

under the AEDPA, in <u>Penetti v. Quarterman</u>, U.S._,127 S.Ct. 2842 (2007).
In <u>Panetti</u>, the Supreme Court explained,

> AEDPA does not 'require state and federal courts to wait for some
> nearly identical fact pattern before a legal rule must be applied.'
> <u>Carey v. Musladin</u>, 549 U.S.---,---, 127 S.CT. 649, 656 (2006)
> (slip op., at 2)(Kennedy, J., concurring in judgement.) Nor does
> AEPDA prohibits a federal court from finding an application of a
> principle unreasonable when it involves a set of facts different
> from those of the case in which the principle was announced.
> [citation omitted] The statute recognizes that, to the contrary,
> even a general standard may be applied in an unreasonable manner.

<u>Panetti</u>, 127 S.Ct. 2842, 2858. Here, unlike <u>Musladin</u>, and the authorities
the Court relied on in that context, the present case does not pose a
completely different scenario than what the Supreme Court faced in <u>Hill</u>.
<u>Hill</u> involved prison disciplinary hearings and the present case concerns
prison parole hearings. Both are conducted by the state and both address
how long a prisoner may be incarcerated. Because both hearings are given
by the same entity within the state, the correctional division of the
state's executive branch, the Ninth Circuit has repeatedly used the
standard espoused in <u>Hill</u> as clearly established Supreme Court authority
for the application of the "some evidence" standard in the parole context.
See, <u>Irons II</u>, <u>supra</u>, 479 F.3d 658 (9th Cir. 2007); <u>Sass v. California
Board of Prison Terms</u>, <u>supra</u>, 461 F.3d 1123, 1129 (9th Cir. 2006); and
<u>McQuillion v. Duncan</u>, <u>supra</u>, 306 F.3d 895, 904 (9th Cir. 2002.) As
explained by the Supreme Court in <u>Panetti</u>, <u>Musladin</u> does not prohibit
the use of <u>Hill</u> as clearly established Supreme Court authority. The result
is that Petitioner's level of due process is not limited to, as the
Respondent claims, "...an opportunity to be heard and notice of any
adverse decision." <u>Panetti</u>, 127 S.Ct. at 2858.

> II.   THE BOARD'S RULING RELIES UPON UNCONSTITUTIONALLY
>       VAGUE LANGUAGE, CONTRARY TO CLEARLY ESTABLISHED
>       SUPREME COURT LAW, THAT IS APPLIED IN AN
>       UNCONSTITUTIONALLY VAGUE MANNER.

1   In evaluating an inmate's suitability for parole, The board is only

2   permitted to come to a finding of unsuitability if the inmate currently

3   poses an unreasonable risk to public safety if released on parole. (Cal.

4   Code of Regulations, Title 15, §2402(a); In re Scott, supra, 133

5   Cal.App.4th 573, 594-595). The regulations only permit such a finding

6   to be based on the crime if the offense is determined to be "especially

7   heinous, atrocious, or cruel." (Cal. Code of Regulations, Title 15,

8   §2402(c)(1).) That term is further defined by the regulatory criteria

9   as applying only when the crime is of a particularly egregious type,

10  fitting defining principles set out in the regulation. (Cal. Code of

11  Regulations, Title 15, §2402(c)(1)(A)-(E).) These criteria are overly

12  vague, leaving Petitioner frustrated and unable to determine if the

13  criteria should properly apply to his particular offense. Petitioner's

14  point is better made by citing the Hon. J. England, Magistrate Judge,

15  United States District Court, Eastern District of California in Bair v.

16  Folson State Prison, Slip Copy, 2005 WL 3081634, at *7, *16 (E.D.Cal.)[1]

17          "As it stands now, the law in California permits parole to be
            denied solely [italics omitted] on the basis of the nature of
18          the crime. 'The nature of the prisoner's offense, alone, can
            constitute a sufficient basis for denying parole.' In re
19          Rosenkrantz, 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 1104 (2002).
            However, the historical facts of the crime will never change,
20          and all prisoners having been found to have committed a crime
            with facts 'more than minimally necessary to convict,' nearly
21          everyone, can have their life with parole case effectively
            tranmuted to life-without-parole--because the facts of the
22          offense will never change. Under present California law, the
            BPT does not set the sentence, and therefore due process does
23          not permit the BPT to change the court imposed sentence either
            de jure or de facto [italics omitted]. But, one might argue,
24          a later panel may ultimately assess the unchangeable facts of
            the case differently than the previous panel, or two, or three,
25          etc. This argument, however, gives no substance to due process
            notions. The argument would expressly hinge due process on the
26          luck of the draw, that is, maybe (but doubtful) a panel will
            come along that will view the facts as not more than minimally
27          necessary to convict. Compelling due process to hinge on such

─────────────────────────────────
28  [1] See attached Exhibit A.

1     an arbitrary factor is no due process at all."

2        "Petitioner is frustrated because he senses what the court
has described--having BPT assess what is 'more than minimally

3     necessary to convict' is a standardless review subject to the
arbitrary decisions of BPT commissioners--BPT commissioners can

4     in effect [italics omitted] ignore the possibility of parole
forever based on their own view of the crime, thereby making

5     petitioner's sentence a de facto [italics omitted] life without
the possibility of parole."

6 (Bair v. Folsom State Prison, Slip Copy, 2005 WL 3081634, at *7, *16

7 (E.D.Cal.).)

8       A.   THE BOARD'S RULING RELIED UPON LANGUAGE
           THAT WAS UNCONSTITUTIONALLY VAGUE.

9

10     The use of the phrase "especially heinous, atrocious, or cruel" is

11 unconstitutionally vague. (see Maynard v. Cartwright, 486 U.S. 356, 363

12 (1988) and Godfrey v. Georgia, 442 U.S. 420 (1980).)  While it is true

13 that the phrase "especially heinous, atrocious, or cruel" is qualified

14 by the defining factors listed in California Code of Regulations, Title

15 15, Z2402(c)(1), and because the Board has always viewed those as non-

16  exhaustive, they are of little guidance in interpreting the breadth of

17 the phrase. Since the Board considers itself completely unrestricted,

18 any reason can be cited for claiming the offense was "especially heinous,

19 atrocious, or cruel," in which case, the purpose of listing factors to

20 explain the otherwise unconstitutionally vague phrases would be defeated.

21     Furthermore, none of the five listed factors provide assistance with

22 regard to the arbitrary use of the phrases at issue because the Board

23 regularly misapplies all of these factors. For example, the courts have

24 attempted to give the "callousness" criteria some meaning, through

25 decisions such as In re Ernest Smith, supra, 144 Cal.App.4th 343, 367

26 (2003), which analyzed the extent that the inmate induced terror before

27 the killing, caused untold suffering, or unnecessarily prolonged the

28 ordeal. Here the Board cited the factor of  callousness, but failed to

explain how the alleged callousness shows Petitioner to be currently an

unreasonable risk to public safety if released on parole, particularly

when the actual facts of the commitment offense are compared to the

elements of other second-degree murders. There is no evidence in the

record to indicate that Petitioner acted with cold, calculated, dispassion;

or that he tormented, terrorized, or injured the victim before deciding

to kill the victim; or that Petitioner gratuitously increased or

unnecessarily prolonged the victim's pain and suffering. Second-degree

murder is always callous and cruel, but the facts of Petitioner's case

do not indicate that this case is "especially" heinous and cruel in a way

that would distinguish it from other murder cases as being "Particularly

egregious."(In re Ernest Smith, supra, 114 Cal.App.4th p.376; In re Van

Houten, 116 Cal.App.4th 339, 351 (2004); In re Scott, supra, 119 Cal.App.4th

pp.891-892; and In re Rosenkrantz, supra, 29 Cal.4th p.683).

    B.    THE BOARD HAS ARBITRARILY APPLIED THE
          SUITABILITY FACTORS OF §2402(c)

    The court in In re Ernest Smith, 114 Cal.App.4th 343, 369 (2003)

stated that when the "record provides no reasonable grounds to reject,

or even challenge, the findings and conclusions of the psychologists and

counselor concerning [the inmate's] dangerousness" the Board may not do so.

Yet, that is precisely what the Board routinely does, rejecting favorable

psychological reports in order to rely exclusively on the crime. This

reasoning is particularly applicable here, where no one, including the

Board, has challenged Petitioner's psychological reports, which have always

been favorable, yet the crime is used again and again to justify the the

denial of parole. This is an example of the Board's failure to properly

discharge their duties by examining the facts of the commitment offense

to determine if the crime is truly particularly egregious in a way that

rationally shows Petitioner is currently an unreasonable risk to the public if released on parole.

Furthermore, when an inmate, such as Petitioner, who pled guilty to second degree murder, has been incarcerated long enough that, with custody credits, he would have reached the minimum eligible release date if he had been convicted of first degree murder, the Board must then show that his crime was more egregious for even a first degree murderer in order to justify using the crime as a basis for a denial. (In re Weider, supra, 145 Cal.App.4th 570, 582-583 (2006). Here, Petitioner reached his actual MEPD in February of 1998, and would have passed a first-degree MEPD in late 2004. Thus the Board and the reviewing court has a duty to provide Petitioner the "some evidence" that his crime was so egregious that not only could it be considered particularly egregious in comparison to other second degree murders, but is particularly egregious in comparison to first degree premeditated murders, a showing the Board did not and cannot satisfy. Thus this Honorable Court should find that the Board's application of the §2402(c)(1) factors to Petitioner's case was unconstitutional.

III.    BECAUSE THE BOARD'S DECISION FINDING THAT PETITIONER WAS AN UNREASONABLE RISK OF DANGER TO SOCIETY IF RELEASED FROM PRISON WAS NOT SUPPORTED BY ANY EVIDENCE, IT WAS A VIOLATION OF CLEARLY ESTABLISHED FEDERAL LAW.

Respondent takes issue with what the appropriate focus must be when a court reviews the evidentiary sufficiency of a parole decision. (See generally, Respondent's Answer, pp. 6-7.) This issue was described by the California Supreme Court in the case of In re Rosenkrantz, supra, 29 Cal.4th 616, at 658 (2002), noting,

"[T]he judicial branch is authorized to review the factual basis

of a decision of the Board denying parole in order to ensure that
the decision comports with the requirements of due process of law,
but...in conducting such a review, the court may inquire only
whether some evidence in the record before the Board supports the
decision to deny parole, based upon the factors specified by
statute and regulation." (Rosenkrantz, supra, 29 Cal.4th at p.658.)

It is clear from the language in Rosenkrantz that there must be
"some evidence" in the record "to support the decision to deny parole,
based upon the factors rather than merely "some evidence" to support
a particular factor, and Rosenkrantz repeatedly emphasized that the some
evidence standard applies to the decision. Rosenkrantz, at 664 & 667.)
Under California Code of Regulations, Title 15 §2402(a), a finding of
unsuitability under the Penal Code §3041(b) "public safety" exception
requires a finding that the inmate currently poses an unreasonable risk
to public safety if paroled. (In re Scott, supra, 133 CAl.App.4th 573,
594-595 (2005).) When the Board denies parole, it specifically makes a
finding under §2402(a) that "the prisoner will pose an unreasonable risk
of danger to society if released from prison." This is the decision, that
the inmate presents a current and unreasonable risk to public safety,
that must be supported by the requisite "some evidence."

Recent published opinions have clarified that he reviewing court
must determine whether or not there is "some evidence" of the inmate's
current dangerousness. "The test is not whether some evidence supports
the reasons the [Board] cites for denying parole, but whether some
evidence indicates a parolee's release unreasonably endangers public
safety." (In re Lee, supra, 143 Cal.App.4th 1400, 1408-1409 (2006);
Sanchez v. Kane, supra, 444 F.Supp.2d 1049 (C.D. Cal. 2006); Rosenkrantz
v. Marshall, supra, 444 F.Supp.2d 1063, 1085 (C.D. Cal. 2006); and In
re Weider, supra, 45 Cal.App.4th 570, 589 (2006) ["the overarching
consideration in the suitablilty determination is whether the inmate

is currently a threat to public safety."].) Assuming that there was "some evidence" in the record to support the Board's citation of the §2402(c) factors, Respondent has still failed to address the most important issue, is there any evidence in the record to support the conclusion that Petitioner is currently a danger to society? As explained in Petitioner's original petition, there is no evidence that he is currently an unreasonable threat after more than two decades of exemplary prison behavior and a record rehabilitation.

IV.    CONTINUED RELIANCE ON THE UNCHANGING CIRCUMSTANCES AND PRIOR CONDUCT VIOLATES FEDERALLY PROTECTED DUE PROCESS RIGHTS.

Respondent argues that Petitioner's due process rights were not violated because the court ruled that there was "some evidence" to support its finding. (See Respondent's Answer p.6) Neither the court nor the Respondent has shown a nexus between the "some evidence" of a factor and the conclusion that Petitioner currently poses an unreasonable risk to the public if released on parole. In In re Lee, supra, 143 Cal.App.4th 1403, 1409 (2006), the court stated,

Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.

(In re Lee, supra, 143 Cal.App.4th at 1409 (2006).

In Biggs, the Ninth Circuit explained that, "continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (Biggs v. Terhune, supra, 334 F.3d 910, 916-917 (9th Cir. 2003). In Sass, the Court reaffirmed Biggs by noting, "continued reliance...[on] the offense and conduct prior to imprisonment...could result in a due process violation." (Sass v. Calif. Board of Prison Terms, supra, 461 F.3d at 1129.

Finally, in <u>Irons II</u>, the Ninth Circuit stated,

> We note that in all the cases in which we have held that a
> parole board's decision to deem a prisoner unsuitable for
> parole based solely on the basis of his commitment offense
> comports to due process, the decision was made before the
> inmate had served the minimum number of year required by
> his sentence. Specifically in <u>Biggs</u>, <u>Sass</u>, and here, the
> petitioner had not served the minimum number of years to
> which they had been sentenced at the time of the challenged
> parole denial by the board. [citation omitted] All we held
> in those cases, and all we hold today, therefore is that
> given the particular circumstances of the offenses in these
> cases, due process was not violated when these prisoners
> were deemed unsuitable for parole prior to the expiration
> of their minimum terms.

(<u>Irons v. Carey</u>, <u>supra</u>, 505 F.3d at 853-854). Respondent also alleges

that the Ninth Circuit's decisions in <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u> regarding

the some-evidence standard is "improper" and "...is not clearly

established law and is not binding on this Court." (Resp.'s Answer p.6:7-17).

However, Justice Kleinfeld in his dissent from rehearing of <u>Irons</u> en banc

stated,

> Our en banc decision in <u>Barapind v. Enomoto</u> says that an issue
> presented for review and addressed and decided in a panel opinion
> "became law of the circuit, regardless of whether it was in some
> technical sense 'necessary' to our disposition of the case"...thus
> under <u>Barapind</u>, the statements of law made in <u>Irons</u> that were
> unnecessary to the decision may nevertheless be construed by
> subsequent three judge panels, district courts and the state courts
> as binding law of the circuit.

(<u>Irons v. Carey</u>, <u>supra</u>, 505 F.3d 951, 952 (9th Cir. 2007) Order Denying

Petition for Rehearing En Banc, citing <u>Barapind v. Enomoto</u>, 400 F.3d 744,

751, fn. 8 (9th Cir. 2005). Therefore, under <u>Barapind</u>, this Court's

guidance in <u>Biggs</u>, <u>Sass</u> and <u>Irons</u>, is binding on the district and state

courts of this circuit.

The sole purpose of a parole hearing is to determine whether the

inmate is suitable of parole, that is, whether he poses an unreasonable

risk to public safety if paroled. (Cal. Code of Regs., Title 15 §2402(a);

1   Scott II, supra, 133 Cal.App.4th at 594-595), and continued reliance on

2   the commitment offense as a factor in denying parole, when the evidence

3   of rehabilitation is overwhelming, will violate due process. For instance,

4   in Martin, supra, 431 F.Supp.2d, 1038, the court noted that, "[b]ecause

5   petitioner cannot change the past, denying petitioner parole based only

6   on the facts surrounding the crime itself effectively changes his sentence

7   from [fifteen] years to life into a life imprisonment without the

8   possibility of parole." Id. at 1046. Relying on Biggs, the court found

9   no evidence to support the non-offense related factors and held that

10  relying on the unchanging facts of the commitment offense in denying him

11  parole was a violation of due process. (Martin v. Marshall, supra, 431

12  F.Supp.2d 1038, 1046.) Also, in Sanchez v. Kane, 444 F.Supp.2d at 1062

13  (C.D. Cal. 2006) [continued reliance on the commitment offense factors

14  was found to violate the inmate's due process rights after just three

15  prior hearings and fourteen years, as it ignored the fact that he continued

16  to "demonstrate exemplary behavior and evidence of rehabilitation."

17  (Sanchez v. Kane, supra, 444 F.Supp.2d 1049, 1062 (C.D Cal. 2006).

18       Without this Honorable Court's intervention the Board will

19  indefinitely continue to deny Petitioner parole. Thereby converting

20  his life with the possibility of parole to life without the possibility

21  of parole.

22          V.    THE BOARD'S DECISION FINDING THAT PETITIONER
                  NEEDED ADDITIONAL SELF-HELP IS NOT SUPPORTED
23                BY THE EVIDENCE AND HAS BEEN ARBITRARILY APPLIED.

24       Respondents answer contains an argument whereby Respondent alleges

25  Petitioner has not shown that the state courts unreasonably applied the

26  some-evidence standard. There, they point to the decision issued by the

27  superior court finding that the Board's conclusion "...that the gravity

28  of Bradshaw's commitment offense, and his need for additional self-help

1  to deal with stress outside of prison, required a more lengthy period

2  of incarceration in consideration of public safety and supported denying

3  him parole." (Resp.s Answer p.7:13-16). The Board disregarded its own

4  experts when it decided that Petitioner needed additional self-help. That

5  decision is not supported by even a minimal some-evidence test. The states

6  own expert, Dr. Macomber, in his 2005 psychological report states; "Inmate

7  Bradshaw has participated extensively in numerous therapy programs at

8  CMC-E....At this point in time, there is no need for further self-help

9  groups or participation in therapy programs." He goes on to say that,

10  "...his [Petitioner's] potential for dangerous behavior if released to

11  the community, he is no more dangerous than the average citizen in the

12  community." Also, Dr. Zika in his 2004 psychological report he states,

13  "...this inmate remains a suitable and very low risk candidate for

14  release." Then he refers to Dr. Terinni's 1999 report for additional

15  information. In that report, Dr. Terinni states, "This man does not have

16  a mental disorder which would necessitate treatment..." He also states,

17  "In consideration of several factors including...his extensive self-help

18  participation, his violence potential within a controled is considered

19  to be considerably below average..." and "If released to the community

20  his violence potential is considered to be below average relative to

21  the average citizen in the community." (See original petition, Exhibit C.)

22      The court in Smith, 144 Cal.App.4th at 369 (2003) stated that when

23  the "record provides no reasonable grounds to reject, or even challenge,

24  the findings and conclusions of the psychologists and counselors concerning

25  [the inmate's] dangerousness" the Board may not do so. (In re Ernest Smith,

26  supra, 144 Cal.App.4th 343, 369 (2003).

27  /

28  /

CONCLUSION

Based on the foregoing, Petitioner respectfully requests that this Court issue a Writ of Habeas Corpus, directing that he be discharged from all custody, actual and constructive, or alternatively, order the Board of Parole Hearings to conduct a new hearing and absent any new evidence to show adverse change since the 2006 hearing, to find Petitioner suitable for parole and set a parole date consistent with the matrix for second degree murder. (Cal. Code of Regs., Title 15 §2403(d).

Dated: 8-18-08                     Respectfully submitted,

                                   _____
                                   William Bradshaw
                                   Petitioner , In Pro Per

EXHIBIT A

Slip Copy, 2005 WL 2219220 (E.D.Cal.)
Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
Clifford Lee **BAIR**, Petitioner,
v.
**FOLSOM** STATE **PRISON** , et al., Respondent.
No. CIVS-04-2257MCEGGHP.
Sept. 12, 2005.

Clifford Lee Bair, Tracy, CA, pro se.
Daniel J. Kossick, Department of Justice, Office of the Attorney General, Sacramento, CA, for Respondent.

*AMENDED*
*FINDINGS AND RECOMMENDATIONS*

HOLLOWS, Magistrate J.

I. *Introduction*

*\*1* Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1984, petitioner was convicted of first degree murder, three counts of burglary, two counts of false imprisonment, three counts of grand theft, two counts of receiving stolen property and one count of destruction of phone lines. Answer, Exhibit A. He is serving a sentence of 27 years to life. *Id.*

In the instant action, petitioner challenges the 2003 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole. This was petitioner's second parole suitability hearing. Answer Exhibit C. Petitioner raises the following claims: 1) Cal.Penal Code § 3041 creates a liberty interest in a presumptive parole release date; 2) the BPT did not have sufficient evidence to find that petitioner posed an unreasonable risk of danger to society if released on parole; 3) the BPT did not have sufficient evidence to find him unsuitable for parole; 4) the failure of the BPT to set a term proportionate to petitioner's offense violates the Eighth and Fourteenth Amendments.

On July 7, 2005, the court recommended that the petition be denied. However, on June 15, 2005, in *Sass v. Cal. Board of Prision Terms,* 376 F.Supp.2d 975, 2005 WL 1406100 (E.D.Cal.2005), Judge England held that the California parole scheme for indeterminate sentences does not create a federal liberty interest. At the time Judge England decided *Sass,* the findings and recommendations in this action had already been prepared. The court now vacates the July 7, 2005, findings and recommendations and recommends that the petition be denied pursuant to *Sass.* However, the court respectfully requests that Judge England reconsider *Sass* and deny the petition on the alternative grounds discussed below.

II. *Anti-Terrorism and Effective Death Penalty Act (AEDPA)*

The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective. *Neelley v. Nagle,* 138 F.3d 917 (11th Cir.), citing *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. *Moore v. Calderon,* 108 F.3d 261, 263 (9th Cir.1997).

In *Williams (Terry) v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. *Id.* at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

*\*2* "Unreasonable application" of established law, on the other hand, applies to mixed questions of

law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. _Williams (Terry),_ 529 U.S. at 407-08, 120 S.Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an _unreasonable_ application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." _Williams (Terry),_ 529 U.S. at 410-11, 120 S.Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. _Woodford v. Viscotti,_ 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. _Early v. Packer,_ 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. _Id._ An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. _Lockyer v. Andrade,_ 538 U.S. 63, 75-76, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. _Early v. Packer,_ 123 S.Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." _Himes v. Thompson,_ 336 F.3d 848, 853 (9th Cir.2003).

The Sonoma County Superior Court issued a reasoned opinion addressing petitioner's claim alleging insufficient evidence to support the suitability finding. Answer, Exhibit E. The California Supreme Court issued a summary denial of petitioner's habeas petition challenging the 2003 hearing. Answer, Exhibit D. Accordingly, the court "looks through" the summary disposition to the last reasoned decision, i.e. the opinion of the Superior Court, in determining whether the state courts reasonably applied clearly established Supreme Court authority in denying petitioner's claim that there was not sufficient evidence to find him unsuitable. _Shackleford v. Hubbard,_ 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (citing _Yist v. Nunnemaker,_ 501 U.S. 797, 803-04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

**\*3** No state court issued a reasoned decision addressing petitioner's claims that Cal.Penal Code § 3041 requires the BPT to set a parole date and that his sentence is disproportionate. Accordingly, the court will conduct an independent review of these claims.

III. _Discussion_

A. _Insufficient Evidence_

In claim two petitioner alleges that the BPT did not have sufficient evidence on which to base the finding that petitioner would pose an unreasonable risk of danger if released. In claim three, petitioner alleges that there was not sufficient evidence to support the BPT's finding of unsuitability. These claims both challenge the sufficiency of the evidence on which the BPT found him unsuitable.

1. _California Parole Criteria_

In _Sass v. Cal. Board of Prison Terms,_ 376 F.Supp.2d 975, 2005 WL 1406100 (E.D.Cal.2005), Judge England found that the California parole scheme for indeterminate sentences does not create a federal liberty interest. _Sass v. Cal. Board of Prison Terms,_ 376 F.Supp.2d 975, 2005 WL 1406100 (E.D.Cal.2005) (Honorable Morrison England). Pursuant to _Sass,_ petitioner's claim that the BPT did not have sufficient evidence on which to base the finding of unsuitability must fail.

For the following reasons, this court respectfully requests that the holding in _Sass_ be reconsidered and that petitioner's application be denied on the alternative grounds discussed below.

Although due process does not require the existence of a parole scheme, California has established one. Not all of the myriad procedures of the parole setting system are pertinent here. The court sets forth that part of the statutory section that is pertinent:

(a) In the case of any prisoner sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Prison Terms shall meet with each inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making

recommendations, and documenting activities and conduct pertinent to granting or withholding postconviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. The panel shall consist solely of commissioners or deputy commissioners from the Board of Prison Terms.

The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime.

**\*4** Cal.Penal Code § 3041.

In compliance with the statutory mandate, the Board of Prison Terms issued regulations which guide it in finding prisoners convicted of life offenses with parole eligibility for parole setting. Cal.Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for parole. Section 2402(a) provides that regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Section 2402(c) sets forth the circumstances tending to show unsuitability. The court lists those of significance here:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

\* \* \* \* \*

\* \* \* \* \*

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome ...

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

**\*5** (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

The Ninth Circuit has held that California's parole scheme gives rise to a cognizable liberty interest in release on parole. *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003). Only one aspect of that liberty interest is of pertinence here: "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." *Id.* The evidence underlying the board's decision must have some indicia of reliability. *Id.*

In *Biggs,* the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917. *Biggs* is in conformance with the stated goals of California's parole establishment system--that is, the goal is not to release persons who will be a danger to the community if released. Clearly, when looking at the commitment offense in terms of this goal, one would attempt to use it for its predictive value. The more violent, thoughtless, and callous the crime, the more likely it could be said that the perpetrator would exhibit those tendencies again. One who not only killed, but excessively violated society's norms, is a person less likely to care about those norms when released. But, the purpose of prison, aside from punishment, is to determine for parole eligibility purposes when, if ever, these presumptions have been confirmed or rebutted.

**\*6** The California Supreme Court, having once seemingly agreed with the Ninth Circuit, *see In re Rosenkrantz,* 29 Cal.4th 616, 683, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002), stating that in order for the BPT to put weight on the exceptional nature of the crime (murder), the murder had to be "particularly egregious," has now defined that term as simply "that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." *In re Dannenberg,* 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 440, 104 P.3d 783 (2005). Of course, as the dissent in *Dannenberg* pointed out, this standard is completely unreviewable. 34 Cal.4th at 1102, 23 Cal.Rptr.3d at 446, 104 P.3d 783. The minimal elements of the crime are simply that a person dies at the hands of another with the perpetrator exhibiting the requisite intent. *Any* fact in addition to this could be one viewed as "more than minimally necessary to convict." For example, one BPT panel may believe that use of a knife per se causes undue suffering; another may believe use of any weapon where death is not instantaneous, probably the vast majority of murders, exhibits callousness. A conclusion can easily be reached by those who want to claim that the facts of *any* murder are such that they prove more than those facts minimally necessary for a conviction. There can be no doubt that *Dannenberg* gives carte blanche to the BPT to issue a mere characterization of the crime to support a denial of parole. For the due process issue, the question is whether AEDPA insulates this authority from review in habeas corpus. Clearly, federal due process is not defined by all the intricacies of state law regardless of whether the state law gives rise to the protectable liberty interest.

Although state laws may in certain circumstances create a constitutionally protected entitlement to substantive liberty interests, see, e.g., *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tracy v. Salamack,* 572 F.2d 393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not create federally protected due process entitlements to specific state-mandated procedures. "Elevating a state-mandated procedure to the status of a constitutionally protected liberty or property interest, would make process an end in itself rather than a requirement whose constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement." *Sealed v. Sealed,* 332 F.3d 51, 57 n. 5 (2d Cir.2003) (quoting *Olim,* 461 U.S. at 250-51, 103 S.Ct. 1741, 75 L.Ed.2d 813, and *Doe v. Milwaukee County,* 903 F.2d 499, 503 (7th Cir.1990). *Holcomb v. Lykens,* 337 F.3d 217, 224 (2nd Cir.2003).

All that federal law requires for parole hearing due process is that the inmate up for parole

consideration be given a hearing with minimal rights and that the decision be supported by "some evidence ." *Biggs, supra.* Because the federal due process in parole suitability hearings arises from a liberty interest created by state law, [FN1] state courts are generally free to define their law in connection with the liberty interests as the final arbiters of their state law. Thus, in general, if state courts desire to define their state's parole criteria in a restrictive fashion, the liberty interest is characterized by those restrictive holdings.

> FN1. Federal due process does not require that a state have a parole system. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979).

**\*7** However, state courts may not interpret their law in such an arbitrary manner that the interpretation is nothing but an evasion of the federal due process requirements, minimal as they may be. "[W]e are bound by the state's construction [of state laws] except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." *Peltier v. Wright,* 15 F.3d 860, 862 (9th Cir.1994); *see also Oxborrow v. Eikenberry,* 877 F.2d 1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation."). The question ultimately to be decided here is whether the *Dannenberg* interpretation is so unreviewable, i.e., the facts underlying *any* murder can stand as "some evidence" to deny parole suitability, that the federal standard of "some evidence" is, in essence, completely eviscerated.

The undersigned is mindful that a majority of justices on the California Supreme Court in *Dannenberg* (4-3 decision) implicitly answered the question in the affirmative, although federal due process and liberty interests were not at issue per se in that case. Therefore, it would, and should, be rare indeed that a lower court federal judge should find the decision of a state supreme court to be an unreasonable application of clearly established Supreme Court authority. The question goes so much further than whether the undersigned believes that the dissent had the better of the argument. Even clear error is insufficient. That having been said, the undersigned cannot find a justifiable reason to find that the determination was reasonable.

As it stands now, the law in California permits parole to be denied *solely* on the basis of the nature of the crime. "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." *In re Rosenkrantz,* 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 1104 (2002). However, the historical facts of the crime will never change, and all prisoners having been found to have committed a crime with facts "more than minimally necessary to convict," i.e., nearly everyone, can have their life with parole case effectively transmuted to life without parole--because the facts of the offense will never change. Under present California law, the BPT does not set the sentence, and therefore due process does not permit the BPT to change the court imposed sentence either *de jure* or *de facto.*

But, one might argue, a later panel may ultimately assess the unchangeable facts of the case differently than a previous panel, or two, or three, etc. This argument, however, gives no substance to due process notions. The argument would expressly hinge due process on the luck of the draw, that is, maybe (but doubtful) a panel will come along that will view the facts as not more than minimally necessary to convict. Compelling due process to hinge on such an arbitrary factor is no due process at all.

**\*8** One final argument could be made to support the *Dannenberg* standard. The BPT is not *compelled* to deny parole solely on the basis of the "aggravated" nature of the crime. But this argument does not cure the due process defect either. Simply because some inmates may, at essentially the sole discretion of the BPT, receive a parole eligibility finding despite the existence of an unreviewable and standardless "nature of the crime" factor (and not many inmates have)--does not mean that the factor is therefore constitutional when used to deny parole. The deficiency in the factor is in its standardless, meaningless application per se when used to deny parole suitability. Due process in a particular case is adjudged on an individual, not statistical, basis. In other words, a due process violation against one person is not answered by reference to another person who suffered no ultimate harm as a result of the violation.

Thus, the undersigned must continue to follow *Biggs.* Repeated application of the severity of the crime

factor will violate due process when the crime for which incarceration was required grows more remote. Although the Ninth Circuit in *Biggs* did not explicitly state when reliance on an unchanging factor would violate due process, it makes sense that reliance on such a factor becomes unconstitutional when the factor no longer has predictive value.

In *Sass*, Judge England found that no federal liberty interest was created because the wording of the parole statute, Cal.Penal Code 3041(a) ("a panel *shall normally* set a release date..) and § 3041(b) ("the panel ... *shall* set a release date ....") was insufficiently mandatory. Judge England relied heavily on *In re Dannenberg*, 34 Cal.4th 1061, 1098, 23 Cal.Rptr.3d 417, 443, 104 P.3d 783 (2005) which admittedly, and as previously set forth, vested almost unlimited, unreviewable discretion within the BPT when it came to determining parole eligibility. However, even assuming that the "old" Supreme Court paradigm regarding creation of a liberty interest (mandatory act and underlying factual predicates) remains the analytical framework in which to judge the creation of right-to-parole liberty interests, *see* e.g., *Board of Pardons v. Allen*, 482 U.S. 369, 378, 107 S.Ct. 2415, 2421, 96 L.Ed.2d 303(1987) (mandatory language in a parole statute creates a "presumption of release" and gives rise to a liberty interest), California law, both before and after *Dannenberg*, finds that the California parole scheme for indeterminate offenses does create a liberty interest.

In sum, the governing statute provides that the Board *must grant parole* unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen.Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board *must set a parole date* for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. (Cal.Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in this state *have an expectation that they will be granted parole* unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and regulation.

**\*9** *In re Rosenkrantz*, 29 Cal.4th 616, 654, 128 Cal.Rptr.2d 104, 138, 59 P.3d 174 (2003) (emphasis added). It is difficult to conceive of words which mirror the requirements of the *Allen* mandatory-act-in light-of-satisfied-factual-predicates paradigm more than the emphasized words of *Rosenkrantz*. Indeed, *Allen* and *Rosenkrantz* use the same terminology, i.e. "presumption" of release and "expectation" of release. These are the words of liberty interest creation. It is not material that great discretion is vested within the administrative agency granting parole. *Allen supra. See also* the post-*Dannenberg* case of *In re DeLuna*, 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643, 647 (2005): Penal Code section 3041, subdivision (b) requires the Board to "set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." *This statute creates a conditional liberty interest for a prospective parolee.* (Cf. *Rosenkrantz, supra*, 29 Cal.4th at p. 661, 128 Cal.Rptr.2d 104, 59 P.3d 174; *McQuillion v. Duncan* (9th Cir.2002) 306 F.3d 895, 901-902.) (emphasis added) [FN2]

> FN2. *Dannenberg* did find that California prisoners had no liberty interest in a *uniform* parole date, 34 Cal.4th at 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783 (n.18), 23 Cal.Rptr.3d at 443, 104 P.3d 783 (citing *Rosenkrantz*); however, this is a far cry from holding that the parole scheme as a whole does not create a conditional liberty interest.

The undersigned can only find that California law is in disarray on the subject of liberty interest created by the California parole statutes. *Dannenberg* did not overrule *Rosencrantz*, and implied overrulings are extremely disfavored. *Scheiding v. Gen. Motors*, 22 Cal.4th 471, 478, 93 Cal.Rptr.2d 342, 346, 993 P.2d 996 (2000). Indeed, California cases after *Dannenberg* continue to find a liberty interest and cite *Rosencrantz*. Therefore, *Biggs* and *McQuillion* should not, and cannot, be cast aside based on the ambiguities in California law unless the Ninth Circuit so holds.

*2. Analysis*

The court now considers whether there was some evidence to support the panel's finding of unsuitability. As stated above, the 2003 hearing was petitioner's second suitability hearing. To put the findings of the panel in context, the court will first set forth the background of petitioner's offenses, as

summarized in the presentence report:

Clifford Bair was a resident of the Bodega Bay area approximately two or three years ago and at that time did some yard work for Theresa Aiken a long-time resident of Bodega Bay, and commonly known as "The Mother of Bodega Bay." Apparently in more recent times the defendant and his ex-wife, Linda Bair, purchased a home in Visalia, California, where his ex-wife Linda was living in January of this year. During 1983 the defendant apparently was working in the Los Angeles area for a construction company the name of which is in the District Attorney's file if you need it.

On January 20th Linda Bair left Visalia and came to Bodega Bay to visit with family members and left the defendant at her home in Visalia without any transportation. On Saturday night, January 20th, a very nice pickup truck was stolen in Visalia and turned up on January 24th at the Harbor View Motel in Bodega Bay in the possession of the defendant. Mr. Bair checked into the Harbor View Motel at about noontime on January 24th and registered under a false name, address and city. He prepaid for two nights at the motel. This motel is within view of Mrs. Aiken's home and approximately 50-75 yards distance.

**\*10** On the morning of January 25th the defendant was seen in his motel room and the pickup truck was gone. On January 26th the pickup truck was discovered about a mile and a half from Bodega Bay down a ravine totally burned up. There were no license plates on the pickup when found. Also on the 26th of January the defendant "checked out" of the Harbor View Motel and took with him all his trash including trash liners from trash cans and all the towels in the room. No known reason for this conduct.

Sometime in the afternoon of January 26th the defendant apparently purchased a six-pack of beer, a Dragger sandwich, a package of Peanuts and some potato chips at the Dry Dock Café in Bodega Bay. The Dry Dock is within 75 yards of Mrs. Aiken's house and forms a triangle with Mrs. Aiken's home and the Harbor View Motel. Apparently the defendant then went to Mrs. Aiken's home on foot where he somehow overpowered Mrs. Aiken, took her eyeglasses from her, rendering her almost blind, then tied her and gagged her and placed her underneath her bedding and mattresses on the floor of her bedroom. He disconnected the telephone in the home. At about 4:00 in the afternoon or 4:15, Rosie Formasi arrived at Mrs. Aiken's house to deliver her mail. When she entered the home she was ordered by the defendant to lay down on the floor in the bedroom and not to look at his face. He then tied up Rosie Formasi with the electrical wire cut from Mrs. Aiken's iron. The defendant then left Mrs. Aiken's residence taking her eyeglasses and almost all of her keys and her car which was garaged in a separate detached garage. Unfortunately for the defendant, he left behind at Mrs. Aiken's house two Budweiser beer cans, the wax paper from his sandwich, the paper bag for the potato chips, two paper napkins from the Dry Dock and the empty Tom's Peanut sack. Rosie Formasi and Mrs. Aiken were eventually found the following morning at approximately 8:30 when a friend of Mrs. Aiken became concerned over the fact that her car was gone from the garage and could not get an answer on the telephone at the house. Mrs. Aiken was dead when found and Rosie Formasi was found in the living area of the house having crawled there during the night. Rose Formasi suffered from severe swelling of her hands as a result of having been bound all night long.

Sometime during the night, probably between 10:00 PM and midnight, Mrs. Aiken's car became stuck in the shoulder of the Lakeville Highway across the roadway from Gilardi's Resort. This resort is located to the southeast of the city of Petaluma. The defendant, having gotten the car stuck on the shoulder, abandoned the car at that point and stole an oceangoing sailboat from the Lakeville Marina which is a part of Gilardi's Resort. The defendant left in Mrs. Aiken's car a Pepsi Cola can with a thumbprint on it, a Budweiser beer can, and other items which connect back to Mrs. Aiken's house. Also in the car were found all of the keys taken from Mrs. Aiken's and on the ground next to the car were Mrs. Aiken's eyeglasses.

**\*11** Approximately 7:30 on the morning of January 27th, the owner of the sailboat arrived at the marina and discovered the sailboat gone from its berth. He eventually found the sailboat up the Petaluma River stuck in the mud of the bank. As he approached the sailboat, the defendant was observed on deck holding what appeared to be a shotgun or a length of pipe and ordered the owner of the boat not to come any closer.

The owner retreated to the Lakeville Marina where he watched his boat through a monocular until the Sheriff's Department arrived. During that period of time he saw the defendant go over the side of the boat and disappear into the surrounding area. The defendant was eventually found a short distance from the boat hiding in a floodgate. When he was arrested he was wearing clothing stolen from the boat and had on his person a flare gun and flare gun shells, also taken from the boat. On his person were also shotgun shells. The defendant was arrested and taken to Sonoma County Sheriff's Office. At

the Sheriff's Office, while waiting in an interview room, the defendant cut one of his wrists with a piece of plastic in an apparent suicide gesture. He was taken to Community Hospital for treatment and while there he gave a brief statement to Detective Plass in which he admitted he had spent the night on the boat, that he had spent two days at the Harbor View Motel, and that he had bought a six-pack of beer and a sandwich on the previous afternoon from the Dry Dock Café. When he was asked if he had visited an older lady on that previous afternoon, he said he could not remember.
Answer, Exhibit E.

In finding petitioner unsuitable, the BPT made the following findings:
The Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time. The paramount reason would be the timing and the gravity of the offense. Mr. Bair, the offense was carried out in an especially callous manner. There were multiple victims attacked, injured, or killed in the same incident in that Theresa Blanch Aikens, she was 86 years of age, lost her life in this incident, as well as Rosie Formosie was accosted and tied up. And you had a loaded weapon, by the grace of God, more people weren't hurt. You were going after your wife, you had some marital discord. You followed her. You stole a pickup truck and yet today, when we questioned you about why, you really couldn't answer why other than you just lost it and--The offense itself was carried out in a manner which demonstrates, let's see, an especially insensitive disregard for human sufferings. This 86- year-old woman, she deserved to live out the rest of he[r] life in peace. She was a well-respected member of the community--of her community, loved by all, and the motive for this crime was inexplicable and very trivial in relationship to the offense because of marital discord and distrust. These conclusions are drawn from the Statement of Facts wherein the prisoner embarked on-the prisoner embarked on a crime spree of sorts and all because of marital disputes with his wife or spouse intending to follow the-his wife, spy on her. You accosted Theresa Aikens, bound her, took her glasses. Another innocent bystander came to deliver mail and you forced her on the floor and bound her. And then you not only left there, went off, took her vehicle from there, then you got into a boat, took a boat. Nevertheless, these conclusions are drawn from the Statement of Facts where the victim-one of the victims lost her life. She was left bound and gagged under some bedding and a mattress. She died as a result of your actions. Previous record, the prisoner has an escalating pattern of criminal conduct, a history of unstable tumultuous relationships with others, coming from a dysfunctional family setting, an abusive father. The prisoner also has a problem with marriages, he's been in five different marriages. He's failed to profit from society's previous attempts to correct his criminality, such attempts included probation, county jail time, fines, restitution for fines. The prisoner has an unstable social history of prior criminality which includes as I mentioned earlier about the use and abuse of substances, illegal substances such as alcohol and drugs and possession of a-arrest for possession of a sawed-off shotgun. Institutional behavior, the prisoner has programmed in a limited manner while incarcerated. He's not sufficiently participated in beneficial self-help and therapy programming at this time. Parole plans, the prisoner lacks realistic parole plans in the last county of legal residence of the county of commitment, he does not have acceptable employment plans at this time. 3042 Notices indicate opposition to a finding of suitability, specifically-on, in terms of plans, I mean to mention as well, he does have some alternate plans in an alternate county. However, the county of commitment or the county of last residency, he has none. 3042 Notices, the Hearing Panel notes responses to 3042 Notices indicate an opposition to a finding of suitability, specifically the District Attorney's Office of Sonoma County w [h]here representatives here and present and they're in opposition to a finding suitability here today. Other information bearing on his suitability would be that the prisoner's counselor, a CC-I D.W. Nelson wrote in the current Board report of the prisoner that he would pose a moderate degree of threat if released to the public at this time, today. Remarks, the Panel makes the following findings: That the prisoner still needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner so that he can better understand the causative factors of why he did what he did, why he chased his wife half way across the state, stealing a vehicle, stealing several vehicles, and a vessel, and then accosting, causing the disruption of life for one of our senior citizens. And until progress is made, the prisoner continues to be unpredictable and a threat to others. The prisoner's gains are recent, and he must demonstrate the ability to maintain these gains over an extended period of time. Nevertheless, he should be commended for positive work reports, he's been a continuous-positive reports in the PIA metal fab, got a forklift operator's License, participated in 2002 in the Conflict Resolution, as well as Phases Life Skills in 2002 as well. However, these positive aspects of his behavior don't outweigh the factors of unsuitability at this time. This is another three-

year denial, Mr. Bair, and in a separate decision, the Hearing Panel finds that the prisoner has been convicted of murder and it is not reasonable to expect that parole would be granted at a hearing during the next three years.

**\*12** Answer, Exhibit B, pp. 67-71.

The court now considers whether there was some evidence to support the BPT's finding of unsuitability. The panel first found petitioner unsuitable based on several unchanging factors such as the circumstances of his commitment offense and unstable social history. As discussed above, in *Biggs* the Ninth Circuit found that a continuing reliance on unchanging factors could violate due process. The court does not find that the panel's reliance on these unchanging factors violated due process because the 2003 hearing was only petitioner's second suitability hearing. These factors still had predictive value. [FN3]. Accordingly, the court considers whether some evidence supported the BPT's finding of unsuitability based on these factors.

> FN3. Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally reposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole--a sentence given with the facts of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or

> more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must indicate a *present* danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events.

The panel first found that petitioner's offense involved multiple victims. § 2402(c)(1)(A). This finding was supported by some evidence because petitioner killed Ms. Aiken and injured Ms. Fomasi. The panel also found that the offense demonstrated an exceptionally callous disregard for human suffering. § 2402(c)(1)(D). Petitioner gagged Mrs. Aiken, an elderly woman, and placed her underneath her mattress. He then bound Ms. Fomasi. Leaving these women in these conditions, particularly Ms. Aiken, demonstrated an exceptionally callous disregard for human suffering. This finding was supported by some evidence.

The panel next found that the motive for the crime was inexplicable or trivial in relation to the offense. § 2402(c)(1)(E). At the hearing, petitioner testified that he went to Bodega Bay, where his wife was visiting family, because of marital problems. Answer, Exhibit B, pp. 11-12. He had given up on life. *Id.*, p. 16. When asked why he committed the crime against Ms. Aikens, petitioner stated that it did not make any sense. *Id.*, p. 15. He testified that Ms. Aikens just happened to live in Bodega Bay and just happened to be where he was at the time. *Id.*, p. 16. Ms. Formosi just stumbled into the situation. *Id.*, p. 16. Based on petitioner's description of his motive, the court finds that the BPT's finding that his motive was inexplicable or trivial was supported by some evidence.

The panel next found that petitioner had a previous record of violence. § 2402(c)(2). Petitioner had adult convictions for reckless driving, possession of amphetamines, a fish and game violation for possession of a sawed off shotgun, loaded shotgun in a vehicle, under the influence of alcohol or drugs and vandalism. Answer, Exhibit B, p. 18. These offenses did not involve petitioner inflicting or attempting to inflict serious injury on a victim at least insofar as the court can tell from this record.

Therefore, the BPT's finding of unsuitability based on § 2402(c)(2) was not supported by some evidence. A finding of suitability can be based on the lack of any significant history of violent crime. § 2402(d)(6). As far as this court can tell, the convictions listed above do not demonstrate a significant history of violent crime.

*13 The panel next found that petitioner had an unstable social history. § 2402(c)(3). This finding was based on petitioner coming from a dysfunctional family with an abusive father and his five marriages. That petitioner came from a dysfunctional family and had an abusive father was not petitioner's doing. The court does not find that petitioner's family background demonstrates petitioner's inability to have stable relationships. Having been divorced does not necessarily demonstrate a history of unstable or tumultuous relationships. However, having been divorced *five times* does indicate an unstable social history particularly when petitioner admitted that his alcohol and drug abuse contributed to this pattern. Exhibit B, p. 20. Accordingly, the court finds that this finding was supported by some evidence.

The panel also found that petitioner's institutional behavior supported a finding of unsuitability. § 2402(c)(6). Petitioner's disciplinary record included four 128(a)'s (chronos) for failing to report to close count, covering his cell windows, smoking and refusing to perform a job assignment. Exhibit B, p. 23. Petitioner received a rules violation for smoking on a work site. *Id.*, pp. 23-24. This record does not demonstrate that petitioner engaged in serious misconduct while in prison, as required by § 2402 (c)(6). Accordingly, this finding was not supported by some evidence.

The BPT went on to discuss two of the factors tending to show suitability in § 2402(d) which it found petitioner did not meet. The panel found that petitioner had not programmed sufficiently (§ 2402(d) (9)) and lacked realistic parole plans (§ 2402(d)(8)). With respect to programming, the panel stated that petitioner had not sufficiently participated in beneficial self-help and therapy programming and had programmed in a limited manner. Exhibit B, p. 69. At the hearing, the BPT noted that petitioner had completed his Alternatives to Violence and Anger Management Program. Exhibit B, p. 23. Petitioner had also participated in NA/AA since June 8, 2001. *Id.* He also enrolled in the Friends Outside Creative Conflict Resolution Program. *Id.*, p. 24. This program involved three eight hour sessions emphasizing values and strengths while learning and practicing appropriate anger management and conflict resolution skills. *Id.*, p. 25. The BPT read into the record portions of the psychological report prepared by Dr. Macomber:

Mr. Bair related in an outgoing serious and cooperative manner. He was alert and well oriented. His thinking was rational and logical. His speech was normal, fluent and goal oriented. He is functioning in the high average ranges intellectually. The affect was appropriate. He related to the--in the interview in an earnest, sincere, open, non-defensive manner. He spoke at some length about how there is no excuse for his behavior in the commitment offense and he appears to be very aware of the great seriousness of his criminal behavior. He impresses as being a very sincere individual with considerable feelings of remorse and sorrow about the commitment offense. There is no indication of any mental or emotional problems in the interview.

*14 * * * * *

He is described-has been described as having an antisocial personality disorder in the past. However, this diagnosis is not appropriate in that he does not meet the criteria for this classification. This man is certainly not criminally oriented in any way. He's also been described as having borderline features in the past. This does not appear to be appropriate although he does not have a pattern of unstable interpersonal relationships which is typically seen in individuals with borderline personality problems. However, these individuals usually continue to act out their emotional distress with repetitive self-destructive behavior which we haven't seen throughout the last 15 years of observation. What does appear to be evident is a passive aggressive personality disorder in which he tends to repress frustration, disappointment and anger, and lets it out in inappropriate and self-destructive as well as overtly destructive ways. This personality characteristic seems to be improving with the years and with his age. At this point in time he has matured a great deal and has shown considerable growth and maturity. It does not appear that the prior personality disorder problems are really evident at this point in his life.

Exhibit B, pp. 38-39.

A copy of Dr. Macomber's report, prepared July 26, 1999, is attached as an exhibit to the petition. In his assessment of petitioner's dangerousness, Dr. Macomber stated,

There has been research done where the results have indicated factors indicating both a high risk for recidivism as well as a low risk of recidivism. Factors in this case associated with a higher risk for recidivism are his history of substance abuse, a family history of a father who was a serious alcoholic,

as well as the history of rather severe physical abuse as a child. Factors indicating a lower risk of re-offense are this man's good institutional adjustment over the years, his stable work history, before and after his incarceration, his lack of violence before the offense as well as since he has been incarcerated and the obvious growth and maturity that has occurred since his initial incarceration. The assessment of dangerousness within the controlled setting of the institution is seen as below average in comparison to other inmates. Assessment of dangerousness if released to the community is also below average in comparison to other inmates. Significant risk factors in this case would be any use of alcohol or drugs.

CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS: There is no evidence of mental or emotional problems that would preclude routine release planning in this case. There is no evidence of mental problems that would require further diagnosis or participation in psychotherapy. This man's reasons for not participating in Alcoholics Anonymous or Narcotics Anonymous appear to be legitimate. However, it is recommended that he participate in some kind of substance abuse program for educational reasons prior to his release. This man's statements of remorse appear to be quite sincere. The probability of him getting into serious trouble in the future is very very small. He is quite happy with his current program which keeps his welding skills current. There are no other psychological recommendations.

*15 The only therapy recommended by Dr. Macomber was for petitioner to participate in a substance abuse program for educational reasons. At the time of the July 25, 2003, suitability hearing, petitioner had been attending NA/AA since June 8, 2001. Petitioner's attendance of NA/AA for two years satisfied Dr. Macomber's recommendation. The court finds that the BPT's finding that petitioner required additional therapy was not supported by some evidence.

The BPT also found that petitioner had not sufficiently programmed, apparently referring to petitioner's post-incarceration vocational history. While petitioner had worked several different jobs since his incarceration, he had not signed up for an actual vocational program. *Id.,* p. 26. Petitioner told the BPT that he had not signed up for a vocational program because he was already a journeyman plumber, a certified welder and a heavy equipment operator. *Id.,* p. 26. In addition, petitioner kept his job in the Prison Industry Authority because he earned money in that position. *Id.,* p. 28.

The BPT's expectation that petitioner participate in a vocational program prior to his release was not unreasonable. While petitioner was apparently trained in other fields, his participation in a vocational program would help increase his chances of finding employment following his release from prison. Accordingly, the court finds that the BPT's finding that petitioner had not adequately programmed was supported by some evidence.

The panel found that petitioner lacked realistic parole plans in Sonoma County, the county of commitment. Petitioner stated that if paroled, he planned to live with his wife in Roseville, which is located in Sacramento County. Exhibit B, p. 42-43. Petitioner had no job offers. *Id.,* p. 47. Instead, he had offers of interviews. *Id.*

Cal.Penal Code § 3003(a) provides that an inmate released on parole shall be returned to the county that was the last legal residence of the inmate prior to his or her incarceration. This section also provides that an inmate may be returned to another county if that would be in the best interests of the public. Cal.Penal Code § 3003(b). In making its decision regarding whether to parole an inmate to another county, the paroling authority shall consider a variety of factors including the verified existence of a work offer and the existence of family in the other county with whom the inmate has maintained strong ties and whose support would increase the chance that the inmate's parole would be successfully completed. Cal.Penal Code § 3003(b)(3), (4).

While petitioner's wife lived in Sacramento County, petitioner had no verified job offers from that county or from any other county for that matter. Under these circumstances, petitioner did not demonstrate that the best interests of the public would be served by return to Sacramento County rather than to his county of commitment. Because petitioner's parole plans were sketchy, the court finds that there was some evidence to support the BPT's finding that he lacked realistic plans for the future.

*16 For the reasons discussed above, the court finds that the 2003 decision by the BPT was supported by some evidence. The court observes that several additional factors tended to show petitioner's suitability such as his lack of a juvenile record (§ 2402(d)(1)), his demonstration of remorse (§ 2402(d)(3)) and age, 58 (§ 2402(d)(7)). The court need not consider these factors at this time because some evidence supported the unsuitability finding.

As discussed above, this claim should be denied pursuant to *Sass, supra.* The court respectfully

requests that the district court reconsider *Sass* and deny this claim on the grounds discussed above.

B. *Penal Code § 3041*

In claim one, petitioner argues that Cal.Penal Code § 3041 requires the BPT to give him a parole date. This claim is also barred pursuant to *Sass, supra*.

The court respectfully requests that Judge England reconsider *Sass* and deny this claim on these alternative grounds. Section 3041 provides that one year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the BPT shall meet with the inmate and *shall normally* set a parole release date. Petitioner appears to argue that because § 3041 provides that the BPT shall normally set parole release dates, the BPT violated due process by failing to set his parole release date.

As discussed above, California's parole scheme gives rise to a cognizable liberty interest in release on parole. *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.2003). "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." *Id*. If there is not some evidence to support a decision denying parole, due process is violated. Therefore, even though California law states that the BPT shall normally set parole release dates, due process does not require the BPT to state a date where some evidence exists demonstrating that petitioner should not be paroled. Accordingly, petitioner's claim that the BPT was required to set his parole release date pursuant to Cal.Penal Code § 3041 is without merit.

C. *Disproportionate Sentence*

Petitioner argues that his sentence is disproportionate to his offense. In essence, petitioner is arguing that his sentence violates the Eighth Amendment.

Petitioner's Eighth Amendment "proportionality" claim is difficult to assess in the context of the case. To the extent that petitioner is claiming that his original 27 years to life sentence was excessive, the present petition is not the vehicle to attack that long ago pronounced sentence. To the extent that petitioner is contending that the BPT has, in effect, given him a life without the possibility of parole sentence, petitioner's claim lacks merit at this time. The BPT, of course, has no actual power to sentence petitioner under California law. Petitioner's claim here is in reality a reprise of his no substantial evidence claim, especially that directed to the nature and seriousness of the crime factor of parole eligibility. Petitioner is frustrated because he senses what the court has described--having BPT assess what is "more than minimally necessary to convict" is a standardless review subject to the arbitrary decisions of BPT commissioners--BPT commissioners can *in effect* ignore the possibility of parole forever based on their own view of the crime, thereby making petitioner's sentence a de facto life without the possibility of parole. However, *at this time* and for the reasons stated previously, the court cannot find a violation of petitioner's liberty interest. Having already adjudicated that claim adverse to petitioner, the court will not repeat the analysis.

*17 Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.1991).

E.D.Cal.,2005.

Balr v. Folsom State Prison

Slip Copy, 2005 WL 2219220 (E.D.Cal.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3081634 (E.D.Cal.)
Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
Clifford Lee **BAIR**, Petitioner,
v.
**FOLSOM** STATE **PRISON** , et al., Respondents.
No. CIVS042257MCEGGHP.
Nov. 16, 2005.

Clifford Lee Bair, Tracy, CA, pro se.
Daniel J. Kossick, Department of Justice, Office of the Attorney General, Sacramento, CA, for Respondents.

*ORDER*

ENGLAND, J.

**\*1** Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On September 13, 2005, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Both parties have filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a *de novo* review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed September 13, 2005, are adopted in full; and

2. Petitioner's application for a writ of habeas corpus is denied.

E.D.Cal.,2005.

Bair v. Folsom State Prison

Slip Copy, 2005 WL 3081634 (E.D.Cal.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____ WILLIAM BRADSHAW _____ , declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

> WILLIAM BRADSHAW _____ , CDCR #: D-73217 _____
> CORRECTIONAL TRAINING FACILITY
> P.O. BOX 689, CELL #: GW-325U _____
> SOLEDAD, CA  93960-0689.

On _____ 8-18-08 _____ , I served the attached:

TRAVERSE TO ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS / MEMORANDUM OF

POINTS AND AUTHORITIES IN SUPPORT OF TRAVERSE

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

AMANDA J. MURRAY                    UNITED STATES DISTRICT COURT
DEPUTY ATTORNEY GENERAL             NORTHERN DISTRICT OF CALIFORNIA
455 Golden Gate Avenue, Suite 11000  450 Golden Gate Ave.
San Francisco, CA. 94102-7004       San Francisco, CA. 94102-9680
(Attorney for Respondent)

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _____ 8-18-08 _____ .

_____
WILLIAM M. BRADSHAW _____
Declarant  in Pro Per